IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL WALKER, | : | Civil No. 3:19-cv-1297 |
| Plaintiff | : | |
| v. | : | (Judge Mariani) |
| RUSSELLA JO BELL and C. SMITH, | : | |
| Defendants | : | |

FILED
SCRANTON
FEB 0 2 2022
Per_____
DEPUTY CLERK

### MEMORANDUM

Plaintiff Michael Walker is currently incarcerated at the State Correctional Institution in Huntingdon, Pennsylvania (SCI Huntingdon). In 2019, he filed the instant *pro se* civil rights action, alleging various constitutional violations by SCI Huntingdon officials.[1] Walker's allegations of First Amendment retaliation survived Defendants' motion to dismiss. Defendants now move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on the remaining Section 1983 claims. For the reasons set forth below, the Court will deny Defendants' Rule 56 motion.

---

[1] Walker initially brought claims pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985. The claims under Section 1985 were dismissed. (*See* Doc. 39 at 3-4). Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

I. **<u>Background</u>**[2]

At all times relevant to this lawsuit, Walker has been incarcerated at SCI Huntingdon. (*See* Doc. 1 ¶¶ 1, 9).[3] While incarcerated, Walker was employed in the "shirt line" section of the garment factory operated by Pennsylvania Correctional Industries at SCI Huntingdon. (*Id.* ¶ 9; Doc. 41 ¶ 9). Walker attests that he began working in the garment factory in November 2014, and for much of his tenure had been supervised—without any incident, infraction, or performance complaint—by a "Mr. Brambaugh."[4] (Doc. 77-1 at 13-14). According to Walker, he had reached an inmate-employment classification of "Class 3, step D," the highest level attainable by a prisoner, getting paid the maximum rate of $0.42 an hour. (Doc. 1 ¶ 55; Doc. 77-1 at 14). In January 2017, Brambaugh was assigned to a different Correctional Industries location. (Doc. 77-1 at 13).

Walker asserts that in May 2017, he began having problems with his new work supervisors, defendants Russella Jo Bell and Connie Smith, both of whom held the position of "foreman" at the garment factory. (Doc. 1 ¶¶ 5, 6, 9-12; Doc. 18). According to Walker,

---

[2] Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

[3] Walker filed a verified complaint signed under penalty of perjury. (*See* Doc. 1 at 20).

[4] In Walker's deposition, his former supervisor's name is spelled "Brumbach." (*See* Doc. 66-1 at 29-30).

2

Bell and Smith took issue with Walker raising concerns about appropriate pay, "staff harassment," and the overall work environment. (Doc. 1 ¶ 12). Walker alleges that on multiple occasions throughout the summer of 2017, Bell and Smith threatened him with termination if he continued to voice his concerns. (*Id.* ¶¶ 13-21).

On October 13, 2017, Walker recalls that Smith ordered him away from his designated work area to another area that needed assistance. (*Id.* ¶ 22). A white inmate, who expressed discomfort working near Walker,[5] complained to Smith and she informed Walker that he would be moved to another work location. (*Id.*) Walker expressed concern to Smith that the white inmate was being shown race-based favoritism, and eventually reported the incident to a manager at the garment factory. (*Id.* ¶¶ 7, 23-24). Walker alleges that he then informed Smith that he would be filing a grievance, to which she purportedly responded, "I don't care what you file because [for] every grievance filed there is a DC-141 Misconduct report that could be filed[;] now get to work." (*Id.* ¶ 25).

Two days later, Walker filed grievance number 701764. (*Id.* ¶¶ 26, 54; Doc. 77-1 at 3-4). In this grievance, Walker complained that Smith had acted in a "discriminatory" manner toward him and showed "favoritism" to a white employee, in violation of the Department of Corrections' code of ethics. (Doc. 77-1 at 3-4). Walker claims that on October 19, Bell and Smith approached him and spoke in a derogatory manner about his

---

[5] Although it is not discussed in the pleadings or briefing, Walker stated in his deposition that he is black. (*See* Doc. 66-1 at 49).

3

October 15 grievance against Smith. (Doc. 1 ¶ 27). Walker alleges that Bell called him "an asshole" for filing the grievance and warned that he was only making things worse for himself. (*Id.*) Walker claims that Smith then threatened him by stating, "You like filing grievances[?] I'm the boss around here, I like filing Misconduct Reports." (*Id.*) Walker further asserts that Bell told him that she and Smith "got your smartass and when the time comes, you're done, now run and file your stupid grievance." (*Id.* ¶ 28).

Walker continued to have problems with Bell and Smith over the following months. He avers that on November 29, after attempting to get permission to have the afternoon off to avoid being supervised by Bell, Bell warned him, "Don't try to avoid me, Ms. Smith told me what you['re] trying to do, your time is coming to its ending, and when it comes nothing, not even a grievance will help you." (*Id.* ¶¶ 32-34). Walker maintains that Smith gave him permission to take the afternoon off because he had finished his assigned tasks, but he was still called for work duty that afternoon. (*Id.* ¶¶ 33, 36). When an officer approached Walker's cell about afternoon work detail, Walker was using the bathroom and told the officer he had "diarrhea and could not make it," to which the officer responded that he would relay the information to Walker's supervisor. (*Id.* ¶ 36).

That same day, Bell filed a Form DC-141 Misconduct Report, charging Walker with "refusal to work." (Doc. 66-1 at 112). The misconduct alleged that Walker "did not report to pm work line" and that, even though he complained that he was suffering from diarrhea, he had "attended work in the am for Mrs. Smith and did not inform her or any block officer of

4

his condition." (*Id.*) Walker alleges that the misconduct was baseless and was dismissed after an informal hearing with his Unit Manager. (Doc. 1 ¶ 38; Doc. 77-1 at 14). Defendants dispute that the misconduct was dismissed, but do not offer an alternative disposition. (Doc. 41 ¶ 38). The misconduct itself states that there was an "informal resolution," and that Walker was not to report back to work until he was seen by his Unit Manager. (Doc. 66-1 at 112). It also appears that the reviewing ranking correctional officer modified the form from a "Misconduct Report" to a "DC-ADM 801 Informal Resolution."[6] (*See id.*).

Walker recalls that, the following day, he reported for work but Smith told him to return to his housing unit. (Doc. 1 ¶ 37). When Walker asked why, Smith purportedly responded, "you were warned before, Mr. Grievance Man, you're fired and don't come back, now go back to your housing until before I issue you a misconduct report for being in an unauthorized area." (*Id.*)

Throughout the beginning of December, Walker continued to experience trouble with Bell and Smith regarding his prison employment. He claims that, on several occasions, he reported for work duty and was turned away by Smith or Bell, often with disparaging or threatening remarks. (*Id.* ¶¶ 39-43).

---

[6] The Court further notes that no misconduct for this date appears on the comprehensive Department of Corrections' Misconducts report for Walker, which was generated and provided by Defendants. (*See* Doc. 66-1 at 116-22).

On December 6, 2017, Walker met with his Unit Manager to discuss the situation regarding his employment and the problems with his supervisors. (*Id.* ¶ 44). Walker recalls that he was told his supervisors believed he should be terminated, but that his Unit Manager did not feel that such action was necessary (although he did warn Walker to "keep away from" Bell and Smith). (*Id.*) Walker reported for work that day, and claims Smith once again told him "his time" was "very limited" and that he should "keep [his] mouth shut and do as [he was] told." (*Id.* ¶ 45). Walker alleges that he was called into the manager's office and warned about filing grievances against his supervisors, and then was again threatened by Bell when he returned to his work area. (*Id.* ¶¶ 46-47). According to Walker, Bell stated, "See smartass you're not that smart at all, now you have everyone mad and against you, you cannot win, your time is coming to its ending." (*Id.* ¶ 47). Walker further alleges that, while waiting to exit the garment factory at the end of the day, Bell approached him and said, "You deserve[] any and everything coming to you, Mr. Grievance Man, I bet after today you wouldn't file another one." (*Id.* ¶ 50).

The next day, December 7, Smith again sent Walker back to his housing unit when he reported for work, purportedly telling him that it was because he continued to file grievances against her and other prison officials. (*Id.* ¶ 51). He claims that both Smith and Bell then made statements to the effect that they "got" him. (*Id.* ¶ 52). That same day, Smith filed a DC-141 Misconduct Report against Walker, alleging that he refused to obey an order, interfered with count, was present in an unauthorized area, and violated the "Blue

inmate handbook." (Doc. 66-1 at 114). The report's "staff member's version" of events essentially states that Walker was not in the proper area for his work line that morning, thereby "interrupting the line movement." (*Id.*) Again, it appears that the reviewing ranking correctional officer modified the form from a "Misconduct Report" to a "DC-ADM 801 Informal Resolution." (*Id.*) This misconduct likewise does not appear on Walker's comprehensive Department of Corrections' Misconducts report. (*See id.* at 116-22).

On December 8, 2019, Walker filed a second grievance—this time against Bell for retaliation—after she sent him back to his housing unit and threatened to issue him another misconduct. (*Id.* ¶¶ 39-40; Doc. 41 ¶ 40; Doc. 77-1 at 8-9). Although this grievance (number 710288) is difficult to read due to poor copy resolution, Walker appears to allege that Bell repeatedly acted in a "vindictive" manner and filed unwarranted misconduct reports against him. (*See* Doc. 77-1 at 8).

Walker appeared before his Unit Manager on December 18, 2017, to address Smith's December 7 misconduct report. (Doc. 1 ¶ 53). He claims that his Unit Manager dismissed the misconduct and charges but advised him that, "to avoid any future conflict" with his supervisors, he would be removed from his position in the garment factory. (*Id.*)

Following his termination, Walker alleges that his job classification was decreased to Class 1, Step A, "the lowest possible designation." (*Id.* ¶ 55). This demotion was accompanied by a significant pay decrease from $0.42 per hour to $0.18 per hour, which Walker calculates as an average earnings reduction from $150.00 to $15.86 per month.

(*Id.*) Walker further asserts that, as of the filing of his complaint, he still has not been able to find another prison employment position due to Defendants labeling him as a "problematic" individual. (*Id.* ¶ 57).

Walker filed suit in July 2019. (Doc. 1). As explained above, his Section 1985 claims were dismissed, leaving only First Amendment retaliation claims against Bell and Smith. (*See* Doc. 39 at 3-4). Bell and Smith now move for summary judgment. (Doc. 65). The motion is fully briefed and ripe for disposition.

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Thus, the nonmoving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual dispute exists. *Anderson*, 477 U.S. at 248. Rather, the nonmovant "must support the assertion by citing to particular parts of materials in the

record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B).

In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue. *Anderson*, 477 U.S. at 250-57. A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (alteration in original) (quoting *Anderson*, 477 U.S. at 252). Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party. *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

III. **Discussion**

Defendants' Rule 56 challenge is difficult to understand. In their opening brief (which is only one page in length), Defendants argue that "Plaintiff's evident dislike for his supervisors when he was working at SCI Huntingdon is not a constitutional claim, it is

9

simply the carping of a troublesome inmate," so summary judgment should be granted in their favor. (Doc. 76 at 1). This opening salvo is followed by a single block quote from an inapposite, unreported district court case dismissing a *pro se* lawsuit after mandatory screening under 28 U.S.C. § 1915A. (*See id.* at 1-2 (quoting *McIntosh v. United States*, No. 1:18-cv-903, 2018 WL 2461763, at *4 (M.D. Pa. June 1, 2018), *aff'd in part, vacated in part by McIntosh v. United States*, 845 F. App'x 88 (3d Cir. 2021) (nonprecedential))).[7]

Walker does his best to respond to Defendants' opening brief, laying out his arguments, along with citations to relevant binding case law, for why his First Amendment retaliation claims survive Defendants' Rule 56 challenge. (*See generally* Doc. 77).[8] Defendants' reply brief provides a bit more substance, essentially contending that because Bell and Smith did not terminate Walker, he cannot establish a claim for retaliation against them. (Doc. 83 at 3). Due to the insufficient nature of Defendants' briefing, the Court will independently examine whether Walker has met his Rule 56 burden as to his First Amendment claims.

Although a prisoner's constitutional rights are necessarily circumscribed, an inmate still retains First Amendment protections when they are "not inconsistent" with prisoner

---

[7] It is possible that Defendants erroneously filed an incomplete supporting brief, as their reply brief mentions "arguments" that were "previously stated," (*see* Doc. 83 at 2, 3), when in fact no arguments were raised in their opening brief.

[8] At several points Walker argues in the alternative that he should be granted summary judgment. (*See, e.g.*, Doc. 77 at 11, 14; Doc. 84 at 7). However, because Walker did not move for summary judgment, comply with the case management deadlines or Local Rule 56.1, or provide Defendants with notice that he was seeking summary judgment, the Court will not entertain these informal requests.

10

status or with the "legitimate penological objectives of the corrections system." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)). To establish a First Amendment retaliation claim, a prisoner must show that (1) "he was engaged in constitutionally protected conduct," (2) he suffered an "adverse action" by prison officials, and (3) the inmate's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)).

Defendants do not challenge the first element—that Walker engaged in constitutionally protected conduct. Nor could they. It is well settled that utilizing the prison grievance system is protected by the First Amendment. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). Walker has also proffered evidence that he suffered an adverse action by prison officials. In fact, he conceivably suffered two: the loss of his prison job, *see Mack v. Warden Loretto FCI*, 839 F.3d 286, 297 (3d Cir. 2016), and the filing of allegedly false misconducts against him for exercising a constitutional right, *see Mitchell*, 318 F.3d at 530 (citing *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002)).

Defendants appear to challenge the third element—causation. There are a variety of ways to establish causation for a First Amendment retaliation claim. One method is to show "unusually suggestive" timing between the protected conduct and the adverse action. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). When a plaintiff relies solely on circumstantial evidence of temporal proximity, the time between the

11

protected conduct and the adverse action is often measured in days rather than weeks or months. *See Conrad v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018).[9] Another approach is to demonstrate "a pattern of antagonism coupled with timing." *DeFlaminis*, 480 F.3d at 267. Finally, causation can be inferred "from the evidence gleaned from the record as a whole." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

The Court finds that the record presents sufficient evidence to permit a factfinder to find a causal nexus between Walker's protected conduct and the adverse actions taken against him. First, the timing of Walker's firing is unusually suggestive, as he was terminated just ten days after filing his second grievance. Even if temporal proximity alone were insufficient, Walker has also demonstrated a pattern of antagonism accompanying that timing. Walker attests, under oath, that Bell and Smith repeatedly and explicitly threatened him with termination for discussing his workplace concerns and for filing grievances against them. Bell and Smith deny making these statements, (*see generally* Doc. 41), but the Court must take Walker's version of the evidence as true since he is the nonmovant. *Big Apple BMW, Inc.*, 974 F.2d at 1363.

Walker has also shown that he was charged with the allegedly false misconducts during the time he was voicing his concerns about Bell and Smith. Although the timing of

---

[9] However, there is no "bright line rule limiting the length of time that may pass between a plaintiff's protected speech and an actionable retaliatory act by a defendant." *Conrad*, 902 F.3d at 184.

the misconducts alone is not unusually suggestive, the circumstances surrounding their issuance tend to infer causation. For example, Walker avers that Bell and Smith made explicit threats that any grievance he filed would be met with DC-141 Misconduct Reports, which is exactly what happened. Moreover, the ranking correctional officer changed both misconducts to informal resolutions, allowing the inference that the allegations therein were insufficiently supported or otherwise rejected. Walker also avers that, prior to Bell and Smith taking over as supervisors, he had no history of job-related performance or behavioral problems, a claim that Defendants do not dispute. Finally, Defendants themselves have proffered inconsistent statements about the misconducts they issued. The misconduct reports allege that Walker committed various minor infractions (disobeying an order, being in an unauthorized location, interrupting line movement, violating an inmate handbook, etc.), while in their answer to Walker's complaint Defendants assert that at least one of the misconducts was "entered against [Walker] due to filing false reports." (Doc. 41 ¶ 36). This evidence, taken together, is more than sufficient to allow a reasonable trier of fact to infer that retaliatory animus was a substantial or motivating factor in the misconducts issued. See Watson, 834 F.3d at 424.

Defendants argue that because Bell and Smith did not make the final termination decision, Walker cannot maintain a retaliation claim against them. This contention is meritless. The evidence Walker has proffered strongly indicates that Bell and Smith were instrumental in Walker's firing, even if neither of them was the ultimate decisionmaker. See,

13

e.g., *McKenna v. City of Philadelphia*, 649 F.3d 171, 177-78 (3d Cir. 2011) (explaining "cat's paw" theory of liability for proving causation, where final decisionmaker need not exhibit retaliatory animus so long as there is sufficient evidence that retaliation was proximate cause of adverse action taken). Notably, Walker has offered evidence that his termination was specifically requested by Bell and Smith and that his Unit Manager fired him because of his ongoing conflict with these supervisors.[10]

At bottom, Walker need only adduce evidence that his protected conduct was a "substantial or motivating factor" in his termination, and he has carried his burden on this issue. He has likewise offered sufficient proof that his protected conduct was a substantial or motivating factor in the allegedly false misconducts filed against him. Consequently, Walker has proffered competent evidence to support all three elements of his *prima facie* retaliation claim against Bell and Smith, so Defendants' Rule 56 motion must be denied.

## IV. Conclusion

For the foregoing reasons, the Court will deny Defendants' motion (Doc. 65) for summary judgment. A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: February 2, 2022

---

[10] Additionally, Defendants do not address the other adverse action—Bell and Smith issuing purportedly false misconduct reports against Walker.

14